# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAAVO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-638-LPS-CJB |
| | ) | |
| AMAZON.COM INC. and AMAZON WEB SERVICES INC., | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| KAAVO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-640-LPS-CJB |
| | ) | |
| TIER 3, INC., APPFOG, INC. and SAVVIS COMMUNICATIONS CORPORATION, | ) ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Presently pending before the Court are motions to dismiss (the "Motions") filed pursuant

to Federal Rule of Civil Procedure 12(b)(6) by Defendants Amazon.com Inc. and Amazon Web

Services Inc. (collectively, "Amazon"), and by Defendants Tier 3, Inc. ("Tier 3"), AppFog, Inc.

("AppFog"), and Savvis Communications Corp. ("Savvis") in these related patent infringement

actions. (D.I. 13, Civil Action No. 15-638-LPS-CJB; D.I. 13, Civil Action No. 15-640-LPS-

CJB)[1] All five Defendants (collectively, "Defendants") argue that Plaintiff Kaavo Inc.'s

---

[1]     Plaintiff had also sued Defendant Cognizant Technology Solutions Corp. ("Cognizant") in another related case, Civil Action No. 15-641-LPS-CJB ("the Cognizant Action"). Cognizant, for its part, had joined with Tier 3, AppFog, and Savvis in filing one of the two motions to dismiss at issue here. The Cognizant Action was subsequently dismissed with

("Plaintiff" or "Kaavo") asserted patent—United States Patent No. 9,043,751 (the "'751 patent")—is directed to non-patent-eligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101").[2] For the reasons that follow, the Court recommends that Defendants' Motions be DENIED without prejudice.

## I.   BACKGROUND

### A.   Factual Background

The '751 patent is entitled "Methods and Devices for Managing a Cloud Computing Environment." (D.1. 1, ex. A (the "'751 patent")) The '751 patent is a continuation of United States Patent No. 8,271,974 (the "'974 patent"), ('751 patent at 1), and the two patents share nearly identical specifications. The '974 patent is the patent that is at issue in an earlier-filed set of related actions (the "*Kaavo I*" actions) involving these same parties. *See Kaavo v. Cognizant Tech. Sols. Corp.*, Civil Action Nos. 14-1192-LPS-CJB, 14-1193-LPS-CJB, 2016 WL 476730 (D. Del. Feb. 5, 2016), *adopted by* 2016 WL 1268308 (D. Del. Mar. 31, 2016) ("*Kaavo I*").[3] The technology described in the '751 patent (and in the '974 patent) relates generally to the fields of "computers, information technology, virtualization, and cloud computing[,]" and more particularly to the "management of a cloud computing environment for use by a software

---

prejudice, due to the parties' filing of a joint Stipulation and Order seeking such dismissal on July 12, 2016. (D.I. 37, Civil Action No. 15-641-LPS-CJB)

[2]      Citations herein are to the docket in Civil Action No. 15-640-LPS-CJB unless otherwise noted.

[3]      In its Report and Recommendation in *Kaavo I*, the Court made reference to certain portions of the '974 patent's specification, including its description of what is a cloud computing environment and of a particular example of an "N-tier" cloud computing environment. *Kaavo I*, 2016 WL 476730, at *1. The Court will assume familiarity with its decision in *Kaavo I* and so does not again relate these same details here.

application." ('751 patent, col. 1:14-19)

**B.    Procedural Background**

Plaintiff commenced these related actions on July 24, 2015. (D.I. 1, Civil Action No. 15-638-LPS-CJB; D.I. 1, Civil Action 15-640-LPS-CJB)  Chief Judge Leonard P. Stark thereafter referred the cases to the Court to resolve any and all matters with regard to scheduling, as well as any motions to dismiss, stay or transfer venue. (D.I. 7, Civil Action No. 15-638-LPS-CJB; D.I. 5, Civil Action 15-640-LPS-CJB)  In both cases, Defendants filed the instant Motions on September 25, 2015, in lieu of answering the respective Complaints; briefing on all three Motions was completed on October 23, 2015. (D.I. 13, D.I. 23, Civil Action No. 15-638-LPS-CJB; D.I. 13, 21, Civil Action 15-640-LPS-CJB)

Defendants, concurrently with filing the instant Motions, moved to stay the cases pending resolution of the Motions. (D.I. 15, Civil Action No. 15-638-LPS-CJB; D.I. 15, Civil Action 15-640-LPS-CJB)  The Court held oral argument on the motions to stay, and subsequently entered an Order staying the cases on January 4, 2016. (D.I. 30, Civil Action No. 15-638-LPS-CJB; D.I. 30, Civil Action 15-640-LPS-CJB)

As to the instant Motions, the Court then heard oral argument on May 12, 2016. (D.I. 37 (hereinafter, "Tr.")) Thereafter, the parties filed notices of supplemental authority. (D.I. 33-34, D.I. 36-37, Civil Action No. 15-638-LPS-CJB; D.I. 35-36, D.I. 39, Civil Action 15-640-LPS-CJB)[4]

---

[4]      Although these notices both contained substantive argument about the cases referenced therein, in violation of District of Delaware Local Rule 7.1.2(b), the Court will here consider the full content of the notices.  That is because (1) they refer to important new case authority regarding Section 101 that was handed down by the United States Court of Appeals for the Federal Circuit after the date of oral argument in this case; and (2) the Court was benefitted

## II.      LEGAL STANDARDS

### A.      Standard of Review Regarding a Rule 12 Motion that Challenges Patent Eligibility Pursuant to Section 101

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).

Here though, this Rule 12(b)(6) Motion is used to assert an affirmative defense—that the patents are subject matter ineligible under Section 101. In that scenario, dismissal is permitted only if the well-pleaded factual allegations in the Complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense. *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Bristol-Myers Squibb Co. v. Merck & Co., Inc.*, Civil Action No. 15-560-GMS, 2016 WL 1072841, at *1 n.1 (D. Del. Mar. 17, 2016); *Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 24 F.

---

by the parties' analysis of that new authority. *See, e.g., TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *3 (D. Del. Apr. 28, 2015) (citing cases), *adopted in all substantive respects*, 2015 WL 4730907 (D. Del. Aug. 10, 2015).

Supp. 3d 922, 927 (N.D. Cal. 2014).

Patentability under Section 101 is a "threshold inquiry" and a question of law. *In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593 (2010). Yet this question of law is also one that "may be informed by subsidiary factual issues." *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)). There is some uncertainty regarding the appropriate standard of proof in Section 101 cases, specifically as to whether a "clear and convincing" standard of proof applies. *See Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 379-80 (D. Del. 2015), *aff'd in part, rev'd in part*, — F.3d —, No. 2015-1769, 2015-1770, 2015-1771, 2016 WL 5539870 (Fed. Cir. Sept. 30, 2016) (citing cases). However, were the "clear and convincing" standard of proof applicable to Section 101 challenges, it would apply only to the resolution of factual disputes, and not to resolution of pure issues of law. *See MAZ Encryption Techs. LLC v. Blackberry Corp.*, C.A. No. 13-304-LPS, 2016 WL 5661981, at *4 (D. Del. Sept. 29, 2016); *TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *5 (D. Del. Apr. 28, 2015) (citing cases), *adopted in all substantive respects*, 2015 WL 4730907 (D. Del. Aug. 10, 2015). And as to the instant Motions, which were filed at the pleading stage (a stage at which any facts of record that are clearly in dispute are to be construed in the light most favorable to the plaintiff), the "clear and convincing" standard of proof should not come into play at all.[5]

---

[5]     *See Blue Spike, LLC v. Google Inc.*, Case No. 14-cv-01650-YGR, 2015 WL 5260506, at *4 (N.D. Cal. Sept. 8, 2015); *Shortridge v. Found. Constr. Payroll Serv., LLC*, Case No. 14-cv-04850-JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015); *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7-8 (C.D. Cal. Mar. 17, 2015); *cf. Modern Telecom Sys. LLC v. Lenovo (United States) Inc.*, Case No.: SA CV 14-

## B.    Need for Claim Construction

There is no hard-and-fast rule that a court must construe terms in the claims at issue before it performs a Section 101 analysis. *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).  In some cases, claim construction is unnecessary. *See, e.g.*, *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 991-93 & n.1 (Fed. Cir. 2014) (holding that a patent claim was subject matter ineligible under Section 101, where the district court did not engage in claim construction, and where the plaintiff "d[id] not explain which terms require construction or how the analysis would change").  In other cases, such as when a Section 101 motion would be well taken even were a plaintiff's proposed claim construction to be accepted, a court may adopt the plaintiff's construction (or the construction most favorable to the plaintiff) for the purposes of the motion. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014).  Alternatively, the Court may decline to rule on a Rule 12 motion prior to engaging in claim construction, *see, e.g.*, *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 835 (E.D. Tex. 2014) (Bryson, J., sitting by designation), or may deny the motion if it appears there are potential constructions of key claim terms that, if adopted, would render the claims subject matter eligible, *see Execware, LLC v. BJ's Wholesale Club, Inc.*, C.A. No. 14-233-LPS, 2015 WL 5734434, at *2-5 (D. Del. Sept. 30, 2015).

In the related (and earlier-filed) *Kaavo I* actions, the cases have progressed to the point

---

1266-DOC (JEMx), 2015 WL 7776873, at *5 (C.D. Cal. Dec. 2, 2015).

where the parties are engaging in the claim construction process[6] regarding certain claim terms

that are very similar (if not identical) to terms found in the '751 patent.  The Court has

determined, however, that it need not wait to address the instant Motions until the claim

construction process in *Kaavo I* is complete.  As will become clear in the discussion below, the

'751 patent's claims are of a kind sufficient to survive the Section 101 challenges at the Rule 12

stage without the need for any further delay in resolving the Motions.

### C.    Assessing Patentable Subject Matter

Patent-eligible subject matter is defined in Section 101 of the Patent Act:

> Whoever invents or discovers any new and useful process, machine,
> manufacture, or composition of matter, or any new and useful
> improvement thereof, may obtain a patent therefor, subject to the
> conditions and requirements of this title.

35 U.S.C. § 101.  In choosing such expansive terms "modified by the comprehensive 'any,'"

Congress plainly contemplated that the patent laws would be given wide scope."  *Diamond v.*

*Chakrabarty*, 447 U.S. 303, 308 (1980).

Yet while the scope of Section 101 is broad, there is an "important implicit exception [to

it]:  [l]aws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty.*

*Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation

omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293

(2012).  "Phenomena of nature, though just discovered, mental processes, and abstract

intellectual concepts are not patentable, [because] they are the basic tools of scientific and

technological work."  *Prometheus*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S.

---

[6]    A hearing on claim construction and a motion for summary judgment on Section
101 grounds in the *Kaavo I* actions is set to occur on November 30, 2016.

63, 67 (1972)).

The Supreme Court of the United States has also recognized, however, that "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Id.*; *see also Alice*, 134 S. Ct. at 2354. This is because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Prometheus*, 132 S. Ct. at 1293; *see also Alice*, 134 S. Ct. at 2354. To that end, it has explained that "an *application* of a law of nature, [natural phenomena or abstract idea] to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original).

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court of the United States provided the framework for assessing whether a patent contains eligible subject matter under Section 101. Under this now familiar two-part test, courts "must first determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 134 S. Ct. at 2355. If so, the courts must then determine "[w]hat else is there in the claims" by considering "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (internal quotation marks and citation omitted). The Supreme Court describes this test as a search for an "inventive concept"—"*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (internal quotation marks and citation omitted).

## III. DISCUSSION

8

The patent-in-suit contains six independent claims (claims 1, 5, 8, 11, 15 and 18), of

which Defendants believe claims 1 and 11 are representative. (D.I. 14 at 6; D.I. 14 at 4, Civil

Action No. 15-638-LPS-CJB)  The Court will focus herein on claim 11[7], which recites:

> **11.** A method comprising:
>
> [(1)] sending, by a computer system, an initialization event based
> on provisioning information in a single file, the initialization event
> causing two or more tiers of a cloud environment configuration to
> be made available to a software application; and
>
> [(2)] subsequently sending, by the computer system, software
> application data to the cloud environment configuration, which,
> upon receipt, causes the software application to begin execution
> in the available tiers of the cloud environment configuration,
>
> wherein the provisioning information comprises types of servers to
> launch in each tier, geographic data, security requirement data,
> pricing preference data, and versioning data.

('751 patent, col. 20:30-45)

Defendants assert that the '751 patent is directed to an abstract idea—specifically, the idea

of "setting up a network environment and making it available to software[,]" (D.I. 14 at 2), or

similarly, of "setting up and managing a computing environment[,]" (D.I. 14 at 4, Civil Action

No. 15-638-LPS-CJB).  In resolving the instant Motions, the Court will refer below to the latter

articulation (which was proposed by Amazon), since it better covers the entirety of the claims of

the patent-in-suit (some of which are focused on the "setting up" of a computing environment, but

others of which also refer to the "managing" of a computing environment).  With that in mind, the

---

[7]      The Court utilizes claim 11 as the representative claim for purposes of resolving
the Motions because that claim received relatively more attention in the parties' briefing. (*See,
e.g.*, D.I. 14 at 8-16; D.I. 17 at 13-14, 15-16)  As will be understood by reading the discussion
below, the Court would reach the same conclusion were it to have focused on claim 1 instead.

Court next takes up both steps of the *Alice* framework.

### A.   *Alice*'s Step One

Under step one of *Alice*, the claims are considered in their entirety to ascertain not simply whether they *involve* a patent-ineligible concept, but whether "'their character as a whole is directed to excluded subject matter'" (here, an abstract idea). *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)). "The 'abstract ideas' category embodies 'the longstanding rule that [a]n idea of itself is not patentable.'" *Alice*, 134 S. Ct. at 2355 (quoting *Gottschalk*, 409 U.S. at 67) (certain quotation marks omitted); *see also McRo, Inc. v. Bandai Namco Games Am. Inc.*, — F.3d —, 2015-1080, 2016 WL 4896481, at *6 (Fed. Cir. Sept. 13, 2016) ("The abstract idea exception prevents patenting a result where it matters not by what process or machinery the result is accomplished.") (internal quotation marks and citation omitted). An abstract idea can be, but need not amount to, a "preexisting, fundamental truth" about the natural world "that has always existed," or a "method of organizing human activity" (such as a "longstanding commercial practice"). *Alice*, 134 S. Ct. at 2356 (internal quotation marks and citations omitted); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256-57 (Fed. Cir. 2014); *cf. CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (explaining that a claim directed to an abstract idea is one directed to a "'disembodied' concept . . . a basic building block of human ingenuity, untethered from any real-world application") (citation omitted). Beyond that, the concept of an "abstract idea" has not been crisply defined, *see Alice*, 134 S. Ct. at 2357 (declining to "labor to delimit the precise contours of the 'abstract ideas' category"), and the Supreme Court and the United States Court of

Appeals for the Federal Circuit have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases, *see Enfish*, 822 F.3d at 1334-35.

The asserted abstract idea at issue here is the same as that proffered by the Defendants in *Kaavo I*: "setting up and managing a computing environment." *Kaavo I*, 2016 WL 476730, at *6. In *Kaavo I*, the Court recognized that this articulation did not adequately take into account the reality that the claims (and the patent) were all about the initialization and management of a *cloud* computing environment. *Id.* But because it was clear to the Court that the concept of "setting up and managing a *cloud* computing environment" was itself an abstract idea, the Court moved on to consider whether the claims were directed to this revised articulation of the idea at issue. *Id.*[8]

Here, just as in *Kaavo I*, Defendants' articulation of the asserted abstract idea does not account for the fact that the patent's claims (including claim 11)—and indeed the patent as a whole—are all about methods, devices and systems relating to *cloud* computing environments. (*See* '751 patent, col. 20:33-34; *see also id.*, col. 1:16-19 ("More particularly, the present methods, devices, and systems relate to management of a cloud computing environment for use by a software application."); *cf. Kaavo I*, 2016 WL 476730, at *6.[9] And yet (and just as it did in

---

[8]    In adopting the Court's Report and Recommendation in *Kaavo I*, Chief Judge Stark agreed that the claims at issue were "drawn to the abstract idea of 'setting up and managing a cloud computing environment'—a somewhat narrower abstract idea than the ones articulated by Defendants" and that "[t]he Court need look only to the claim language to reach this conclusion." *Kaavo Inc. v. Cognizant Tech. Solutions Corp.*, Civil Action No. 14-1192-LPS-CJB, 14-1193-LPS-CJB, 2016 WL 1268308, at *2 (D. Del. Mar. 31, 2016).

[9]    Defendants do note, however, that "even if one were to insert a 'cloud' limitation into the abstract idea [as they have articulated it], . . . the idea would nevertheless remain

*Kaavo I*) the Court determines that "setting up and managing a cloud computing environment" is

in fact an abstract idea. That concept—without more—appears to implicate an idea that is

"devoid of a concrete or tangible application[,]" *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709,

715 (Fed. Cir. 2014), or "untethered from any real-world application[,]" *CLS Bank Int'l*, 717

F.3d at 1286. Nor has Plaintiff, either in *Kaavo I* or in this litigation, sufficiently explained why

considering the idea to encompass a "cloud" environment would, on its face, *necessarily* conjure

to mind sufficiently concrete structure or applications that would take the concept out of the

realm of an abstract idea.[10] *Cf. Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827

F.3d 1341, 1348 (Fed. Cir. 2016) ("An abstract idea on 'an Internet computer network' or on a

generic computer is still an abstract idea.").

The Court next assesses whether claim 11 is "directed to" this abstract idea. *See Alice*,

134 S. Ct. at 2355-56 (seeking to determine, in conducting this inquiry, to what "concept" the

claims are "drawn"). As to how that inquiry should proceed, the Federal Circuit provided some

guidance in *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015).

There, in order to ascertain at step one whether the claims' "character as a whole" was directed to

an abstract idea, the *Internet Patents* Court examined the specification of the patent at issue.

*Internet Patents*, 790 F.3d at 1346. In doing so, it cited to what the patentee had described in the

specification as "the innovation over the prior art" and "the essential, 'most important aspect'" of

---

abstract." (D.I. 21 at 4)

[10]        Indeed, at oral argument, Kaavo's counsel stated that the inclusion of the term "cloud" in the asserted abstract idea is "irrelevant" at step one—in that even if the idea at issue was framed that way, and even if it were an abstract idea, the claims at issue are not "directed to" that abstract idea. (Tr. at 59-60)

the patent: the "end result" of maintaining the data state in the navigation of online forms. *Id.* at

1348; *see also Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375-76 (Fed. Cir. 2016)

(assessing "the focus of the claimed advance over the prior art" in the step one inquiry). The

*Internet Patents* Court ultimately found, however, that the "character of the claimed invention" in

the relevant patent claim was directed to an abstract idea—the "*idea of* retaining information in

the navigation of online forms." *Internet Patents*, 790 F.3d at 1348 (emphasis added). It so

concluded because the "mechanism for maintaining the state [was] not described" in the claim,

"although this [was] stated to be the essential innovation." *Id.* As a result, the claim was

"directed to the idea itself—the abstract idea of avoiding loss of data." *Id.*

Recently, in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), the Federal

Circuit again addressed the *Alice* step one inquiry, in the context of assessing software patents.[11]

There, the plaintiff asserted two patents, both of which were directed to a "logical model for a

computer database[,]"[12] specifically, a "self-referential" model.[13] *Enfish*, 822 F.3d at 1330. At

---

[11] *Enfish* was issued after the Court held oral argument on the Motions. However, as was referenced above, Plaintiff filed notice of this new authority, (D.I. 35), and Defendants provided a response as to why *Enfish*'s factual underpinnings are distinguishable from those at play in the instant litigation, (D.I. 36).

[12] A logical model is a "model of data for a computer database explaining how the various elements of information are related to one another." *Enfish*, 822 F.3d at 1330. It results in "the creation of particular tables of data," but does not otherwise describe how the tables are arranged in physical memory devices. *Id.*

[13] The "self-referential" model recited in the two asserted patents differed from the traditional "relational" model. With the "relational model, each entity (i.e., each type of thing) that is modeled is provided in a separate table." *Enfish*, 822 F.3d at 1330. The "self-referential" model, in contrast, included all the data entities in a single table, with column definitions provided by rows in the same table. *Id.* at 1332. The patents taught that the two defining features of the "self-referential" model—that all relevant information is stored in a single table, and that columns are defined by rows in the same table—allowed for (as compared to other

13

the summary judgment stage, the district court had found all claims invalid as ineligible under

Section 101, concluding that the claims were directed to the abstract idea of "'storing,

organizing, and retrieving memory in a logical table[,]'" or put another way, "'the concept of

organizing information using tabular formats.'" *Id.* at 1337 (citation omitted).

In reviewing the district court's conclusion, the Federal Circuit assessed the claims at step

one of the *Alice* inquiry, and provided additional insight into what the "directed to" inquiry

requires. The *Enfish* Court began by stating that *Alice*'s first step is "a meaningful one" and that

it can thus be expected "that a substantial class of claims are *not* directed to a patent-ineligible

concept." *Id.* at 1335 (emphasis in original) (citing *Alice*, 134 S. Ct. at 2355). The Court also

stated that, as to patent claims directed to software, it did not think that such claims "are

inherently abstract and therefore only properly analyzed at the second step of the *Alice* analysis[]"

since "[s]oftware can make non-abstract improvements to computer technology just as hardware

improvements can[.]" *Id.* And so, the question the *Enfish* Court sought to answer about the

claims at issue was "whether the focus of the claims is on [a] specific asserted improvement in

computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which

computers are invoked merely as a tool." *Id.* at 1335-36.

The *Enfish* Court ultimately found that the "plain focus of the claims" there was on "an

improvement to computer functionality itself, not on economic or other tasks for which a

computer is used in its ordinary capacity." *Id.* at 1336. More specifically, it held that the claims

were "not simply directed to *any* form of storing tabular data, but instead [were] specifically

---

models) faster searching for data within the table, more effective storage of certain data and
increased flexibility in configuring the database. *Id.* at 1333.

directed to a *self-referential* table for a computer database." *Id.* at 1337 (emphasis in original).[14]

In coming to this conclusion, the *Enfish* Court explained that the "necessity of describing the

claims in such a way [was] underscored" by: (1) the specification's emphasis that "'the present

invention comprises a flexible, self-referential table that stores data[,]'"; and (2) the

specification's teaching that the self-referential table "functions differently than conventional

database structures"—in that traditional databases were "inferior" to such a table and that such a

table "achieves other benefits over conventional databases[.]" *Id.* The *Enfish* Court ended by

stating:

> In sum, the self-referential table recited in the claims on appeal is a
> specific type of data structure designed to improve the way a
> computer stores and retrieves data in memory. The specification's
> disparagement of conventional data structures, combined with
> language describing the "present invention" as including the
> features that make up a self-referential table, confirm that our
> characterization of the "invention" for purposes of the [Section]
> 101 analysis has not been deceived by the "draftsman's art." . . . In
> other words, we are not faced with a situation where
> general-purpose computer components are added post-hoc to a
> fundamental economic practice or mathematical equation. Rather,
> the claims are directed to a specific implementation of a solution to
> a problem in the software arts. Accordingly, we find the claims at
> issue are not directed to an abstract idea.

*Id.* at 1339 (citation omitted). Thus, the Court held that the claims at issue were patent eligible.

*Id.* at 1346.

The Federal Circuit found it unnecessary to continue to step two of the *Alice* test in light

---

[14]     This was reflected, as to a key representative claim (a "means plus function"
claim), in the fact that claim's referenced "means for configuring" language required a four-step
algorithm—and the third step of that algorithm read as follows: "For each column, store
information about that column in one or more rows, rendering the table self-referential, the
appending, to the logical table, of new columns that are available for immediate use being
possible through the creation of new column definition records." *Enfish*, 822 F.3d at 1336-37.

15

of its conclusion at step one. *Id.* at 1339. The court recognized, however, that "in other cases

involving computer-related claims, there may be close calls about how to characterize what the

claims are directed to. In such cases, an analysis of whether there are arguably concrete

improvements in the recited computer technology could take place under step two." *Id.*

Similarly, in *McRO, Inc. v. Bandai Namco Games America Inc.*, — F.3d —, 2015-1080,

2016 WL 4896481 (Fed. Cir. Sept. 13, 2016), the Federal Circuit found that a claim that

"focused on a specific asserted improvement in computer animation" was not directed to an

abstract idea. *McRO*, 2016 WL 4896481, at *8. In *McRO*, the plaintiff asserted two patents

related to "automating part of a preexisting 3-D animation method[]" for depicting various facial

expressions of animated characters. *Id.* at *1. The patents at issue highlighted the technological

improvement represented therein by "criticiz[ing] the preexisting . . . approach as 'very tedious

and time consuming, as well as inaccurate . . . .'" *Id.* at *2 (citation omitted).[15] The defendants

argued that "the claims [were] directed to an abstract idea because they only require using

'mathematical algorithms to manipulate existing information to generate additional

information.'" *Id.* at *5 (citations omitted). The Federal Circuit rejected this argument at *Alice's*

step one, focusing on the specific application of the algorithms. Despite the fact that the

invention was "embodied in computer software that is processed by general-purpose computers,"

---

[15]     More specifically, the asserted patents aimed to automate a portion of a 3-D
animator's task that had previously been performed manually with the assistance of a computer.
*See id.* at *2-3. The prior art involved a process in which an animator "would look at the screen
and, relying on her judgment, manipulate the character model until it looked right—a visual and
subjective process." *Id.* at *2 (internal quotation marks and citation omitted). The claimed
method integrated specific rules into computer software to "allow[] for rapid, creative, and
expressive animation products to be produced in a very cost effective manner." *Id.* (quoting
United States Patent No. 6,307,576, col. 2:38-44).

the Court found the claimed process patent-eligible, noting that it "uses a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results. . . ." *Id.* at *8-9.

In light of *Internet Patents*, *Enfish*, and *McRO*, then, is claim 11 "directed to" the abstract idea at issue? One difficulty in answering this question is that although the patent lists various embodiments of the claimed invention, the patent is a lot less clear about exactly what is said to be the "most important aspect" of that invention or the "specific asserted improvement" in computer capabilities that the invention helps to foster. To be sure, the specification (in the "Background" section) does provide that the "present methods, devices, and systems relate to management of a cloud computing environment for use by a software application." ('751 patent, col. 1:16-19) And it describes the listed embodiments of the invention (in the "Summary" section) as "methods for managing a cloud computing environment for use by a software application[.]" (*Id.*, col. 1:41-42) But, unlike some patents, the patent-in-suit does not clearly set out what the asserted problems in the prior art were said to be, followed by a description of how the patented invention is said to address those problems.[16]

The closest the patent gets to discussing a rationale for the invention is when it simply

---

[16]    In its answering brief, Plaintiff makes its own attempt at articulating how the "claims of the '751 patent "solve[d] a difficult problem." (D.I. 17 at 12) There, Plaintiff states: "The claims of the '751 patent solve a difficult problem of executing an application based on specific requirements (type of server, pricing, security, geography, and versioning) using an on-demand configuration of virtual assets from a cloud provider (claim 11) . . . in a N-tier cloud environment configuration, where available resources are effectively infinite and must be virtually and logically assigned for each specific application." (*Id.*) It may be that this was the rationale motivating the patent's issuance. But nowhere in the patent is there mention of this asserted problem (or one similar to it) and how the patented invention did what other prior art solutions had not done or could not do. And Plaintiff cites to nothing in its brief in support of its statement.

17

addresses, in a general fashion, what cloud computing is and how it leverages "[v]irtualization technology." (*Id.*, col. 1:20)  For example, in the "Background" section, the specification explains that cloud computing "facilitates the operation of multiple virtual servers within a single physical server system[]" and goes on to articulate the benefits that stem from the use of such technology (e.g., that users can run software "without impacting users of other virtual servers operating within the same physical server system" or that cloud providers can offer users access to their physical resources even though the users are remote to the cloud provider). (*Id.*, col. 1:20-37)  The specification then discusses methods of setting up and managing a cloud computing environment.  There is no further particularized explanation of why any claimed system or method of setting up and managing a cloud computing environment is said to be an advance on what was known in the art. *See Kaavo I*, 2016 WL 476730, at *10 & n.14.

Taking this all into account, and being mindful too of the very title of the patent ("Methods and Devices for Managing a Cloud Computing Environment"), it seems right to conclude that the purported "most important aspect" of the invention is one that sounds quite broad (and that, as noted above, amounts to an abstract idea):  that the invention teaches various ways of setting up and managing a cloud computing environment.

And in then turning to our representative claim 11, the Court concludes that it is "directed to" the abstract idea at issue (or at least to a part of that idea).  Claim 11 actually has to do only with the "setting up" of a cloud computing environment, not the "managing" of it. (*Compare* '751 patent, col. 20:30-45 (where claim 11 is focused on the "initialization" of the cloud environment and to the subsequent execution of a software application in such an environment) *with id.*, col. 20:46-51 (where dependent claims 12 and 13 appear to more directly capture the

concept of managing the cloud environment, in that they address the "monitoring" of certain data or sending an adjustment event in response to receipt of monitoring environment data)) But the claim's "character as a whole" certainly seems to be about describing a way of "setting up" a cloud computing environment. The claim articulates a method of doing so by: (1) having a computer system send an "initialization event based on provisioning information"; (2) which in turn causes two or more tiers of a cloud environment configuration to be made available to a software application; (3) and then having the computer system send "software application data" to the cloud environment configuration; (4) that causes the software application to begin executing in the tiers of that configuration. (*Id.*, col. 20:30-45); *cf. Kaavo I*, 2016 WL 476730, at *6.

Of course, as will be discussed below in the step two analysis, claim 11 does include some additional detail that is not captured in the articulation of the abstract idea at issue. That detail regards *how exactly* the cloud computing environment at issue is to be set up. A good bit of that detail relates to the particular type of provisioning information that the initialization event is to be based on, and that is used to cause particular tiers of the cloud computing environment to be made available to software. The Court considers it appropriate to evaluate those details at a more "microscopic[]" level at *Alice*'s step two. *See Elec. Power Gr., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. Aug. 1, 2016). This is due to the fact that (as discussed above) the patent specification never explicitly suggests that, *inter alia*, the utilization of this type of provisioning information is the most important aspect of (or essential innovation of) the invention. The presence of such limitations may still save the claim at step two, but the claim will rise or fall at that step. *See Bascom*, 827 F.3d at 1348-49; *Idexx Labs., Inc. v. Charles River*

19

*Labs., Inc.*, Civil Action No. 15-668-RGA, 2016 WL 3647971, at \*4 (D. Del. July 7, 2016); *see also Kaavo I*, 2016 WL 476730, at \*7.

Therefore, the Court concludes that claim 11 is directed to the abstract idea of "setting up . . . a cloud computing environment." It now moves on to assess step two of the *Alice* inquiry.

### B.   *Alice*'s Step Two

Even if directed to an abstract idea, claim 11 may still be patent eligible if it contains an "inventive concept"— an element or combination of elements that are sufficient to "ensure that the patent in practice amounts to *significantly more*" than a patent upon an ineligible concept. *Alice*, 134 S. Ct. at 2355 (emphasis added) (internal quotation marks and citation omitted). There is no "inventive concept" if a claim recites only an abstract idea implemented using "generic" technology to "perform well-understood, routine, and conventional activities commonly used in industry." *Content Extraction*, 776 F.3d at 1348 (citing *Alice*, 134 S. Ct. at 2359); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613-14 (Fed. Cir. 2016). Neither "limiting the use of an abstract idea to a particular technological environment[,]" nor simply stating an abstract idea and adding the words "apply it[,]" will transform an abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358 (internal quotation marks and citations omitted).

Here, both parties agree that claim 11 recites certain limitations on how to accomplish the claimed method. (*See e.g.*, D.I. 17 at 15-16, 18; D.I. 21 at 8-9; Tr. at 10-12)  What the parties dispute is the impact of these limitations—specifically, whether the presence of some or all of them amounts to the inclusion of an "inventive concept."

Defendants assert that, despite claim 11's limitations, the claim "does not specify *how* the

initialization event causes the environment to be made available[]" and that even though the claim may not preempt all means of setting up a cloud computing environment, since it is directed only to an abstract idea, the claim is "not patent eligible regardless of the preemptive scope." (D.I. 21 at 9-10 (emphasis in original))  Kaavo, for its part, contends that such limitations both add an inventive concept and ensure that the claimed method is a practical application of the alleged abstract idea.  (D.I. 17 at 15-16, 18)[17]

In light of the current record before it, the Court concludes that the Motions should be denied without prejudice at *Alice*'s step two.  This is due to, *inter alia*, claim 11's "initialization event" limitation.

This limitation appears in the first step of claim 11.  As noted above, it explicitly requires

---

[17]     At oral argument, Kaavo spent a considerable portion of its allotted time making arguments as to patent eligibility relating to documents that (1) are not referenced in the Complaint or the patent; (2) were not part of the record in this case; and (3) were not otherwise referenced in Kaavo's briefing.  (*See generally* Tr. at 57-91; *id.* at 88)  In doing so, Kaavo relied on, *inter alia*, various types of documents attributable to certain Defendants, including marketing and promotional materials published on Defendant Amazon.com Inc.'s website, a patent application published by a subsidiary of Amazon.com Inc., a patent application from the corporate parent of Defendants Tier 3, AppFog and Savvis, and portions of a prosecution history. (*See, e.g.*, Tr. at 62-67, 74, 79-83)  Even to the extent that the Court could consider these documents in resolving these Rule 12(b)(6) Motions, it will decline to do so, since these arguments were not fairly raised by Plaintiff prior to the oral argument. *See TSMC Tech., Inc. v. Zond, LLC*, Civil Action No. 14-721-LPS-CJB, 2014 WL 7251188, at *7 n.8 (D. Del. Dec. 19, 2014) (citing cases).  Similarly, for the first time at oral argument, Kaavo's counsel suggested that construction of the term "software application data" was necessary to resolve these Section 101 challenges.  (Tr. at 68)  Kaavo's counsel claimed that this argument was made in its answering brief regarding the Motion filed in Civil Action No. 15-640-LPS-CJB, (Tr. at 75-76 (citing D.I. 17 at 11)), but it was not, (D.I. 17 at 11).  Again, the Court declines to address arguments as to patent eligibility nowhere found in Plaintiff's briefing.

Taking this path here does not ultimately harm Plaintiff.  As is further explained below, the Court need not address these arguments in order to find that the instant Motions should be denied.

that the "initialization event" be "based on provisioning information," that it be sent in a "single file" and that it cause "two or more tiers of a cloud environment configuration to be made available to a software application." (*Id.*, col. 20:31-36) The claim further provides in its "wherein" clause that the "provisioning information" (on which the "initialization event" is based) "comprises" (or must include) the "types of servers to launch each tier, geographic data, security requirement data, pricing preference data, and versioning data." (*Id.*, col. 20:42-45)[18] There are at least two reasons why, in the Court's view, the presence of this limitation warrants denial of the Motions.

First, the collective effect of the "initialization event" limitation renders it more plausible that claim 11 describes a sufficiently *specific way* of "setting up a cloud computing environment." While the claim may not articulate *all aspects of how* the "cloud environment configuration" is made available to software or how the "software application data" performs it role, they do provide at least some of the "how" that Defendants contend is missing entirely from the claim. *Cf. DDR Holdings,* 773 F.3d at 1258-59 (finding claims to be subject matter eligible where they "recite[d] *a specific way* to automate the creation of a composite web page by an 'outsource provider' . . . in order to solve a problem faced by websites on the Internet"—and where that "specific way" amounted to a system that directed a visitor to a hybrid webpage, which in turn presented product information from a third party as well as the visual "look and

---

[18]     The Federal Circuit has made clear that the transitional phrase "comprises"—like the term "comprising"—is understood to mean "including but not limited to." *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360-61 (Fed. Cir. 2007).

feel" elements from a host website) (emphasis added).[19]

Second, there appear to be disputed issues of fact here that, when resolved, will bear on whether claim 11's method "would risk disproportionately tying up the use of the underlying ideas[,]" *Alice*, 134 S. Ct. at 2354–55 (internal quotation marks and citation omitted), or "cover all possible ways to achieve the provided result," *CLS Bank Int'l*, 717 F.3d at 1301. Take, for example, the "provisioning information" found in the first step and further limited by the "wherein" clause. ('751 patent, col. 20:32, 42-45) Defendants assert that requiring the inclusion of at least the listed types of data adds nothing to the inventive concept calculus. They claim that since data types are merely "parameters" that would "be logically used to set up [any cloud computing] environment[,]" they do not transform the claim into something "new or inventive." (D.I. 14 at 3-4, *see also id.* at 14 ("These are all conventional and rudimentary considerations that a user would take into account in setting up a secure, cost-manageable network environment for producing intended results with the desired software."); Tr. at 25-26, 42-43)

Yet how, on this record, would the Court be in a position to conclusively determine this—to conclude that the claimed method of initializing a cloud environment configuration is, in the parlance of *Alice*'s step two, something that references no more than "well-understood, routine, and conventional activities"? And, relatedly, how would the Court be in a position to know whether allowing a patent on what is called for in claim 11 will preempt or tie up too much

---

[19]     Defendants admit, albeit with much qualification, that claim 11 contains additional limitations absent from the claims this Court found ineligible in *Kaavo I*. As highlighted at oral argument, it is undisputed that claim 11 recites at least three such limitations: the provisioning information is in a "single file," that "two or more tiers" exist in the cloud configuration" and that the provisioning information must include at least the types of information contained in the claim's "wherein" clause. (Tr. at 10-12; *see also* '751 patent, col. 20:30-45)

of the underlying idea at issue?[20]  Although Defendants assert that this portion of the claim

implicates only conventional activity and raises strong preemption concerns, they cite to no

supporting evidence in the patent (or otherwise) for that claim.  And importantly, here certain

portions of the record appear to cut against Defendants' unsupported assertions.

For example, the '751 patent's specification suggests that the particular data requirements

in the "wherein" clause are a narrower subset of the possible forms of "provisioning information"

that could be used to facilitate an "initialization event."  It explains that there are any of a number

of "[e]xamples of information that may comprise the user-defined provisioning information[,]"

including, but not limited to:

> [G]eographic preference (e.g., geographic restriction of locations for
> data and/or applications), service level requirements (e.g.,
> availability), pricing information, tier definitions (e.g., number of
> tiers, computational resources needed for each tier, security needs
> for each tier), security requirements (e.g., data encryption
> requirements), audit/backup requirements (e.g., frequency of
> backup, data retention specifications), and special monitoring/alert
> requests (e.g., alert when a firewall rule is breached, alert when
> average CPU utilization reaches or exceeds a threshold value for a
> given time in a given tier).

('751 patent, col. 6:47-59; Tr. at 24)  Claim 11, on the other hand, references the use of *some, but*

---

[20]        The Court notes that in *McRo*, the Federal Circuit assessed preemption at step one
of the *Alice* test.  *McRo*, 2016 WL 4896481, at *9 (concluding that a claim was patent-eligible
under step one, and noting in support thereof that the claim limitations "prevent[ed] preemption
of all processes for achieving automated lip-synchronization of 3-D characters").  Previously,
however, the Federal Circuit has considered the issue of preemption at step two of the *Alice*
inquiry.  *See, e.g., Bascom*, 827 F.3d at 1350 (holding that claims reciting a "specific, discrete
implementation of the abstract idea of filtering content" were patent-eligible under step two
because, *inter alia*, the claims did not preempt "all ways of filtering content on the Internet"); *see
also MAZ Encryption Techs., LLC*, 2016 WL 5661981, at *4 (observing that "[t]he Federal
Circuit has considered the issue of preemption at both steps 1 and 2").  Here, the Court considers
preemption concerns at step two.

*not all* of these information types, and also requires that *each of* the listed information types *must be used* in sending an initialization event. ('751 patent, col. 20:42-45; *see also* D.I. 17 at 5 (noting that "five different types of provisioning information must be included in" the "single file" used to generate the "initialization event") (internal quotation marks and citation omitted)) Put differently, the specification makes it clear that initialization events of the kind claimed in claim 11 can be (1) based on types of data that are not called for by the claim; and/or (2) based on data that is not utilized in the same manner as that which is particularly required by the claim. What the specification does not make clear is whether utilizing computer hardware and software in this way, in order to set up a cloud computing environment, would surely equate to the performance of "functions 'known' in the art." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 614.

Additionally, the '751 patent's prosecution history indicates that the Examiner, having previously rejected certain claims as not novel and/or obvious in light of prior art, allowed certain of the claims to issue because of the limitations found in the "wherein" clause of claim 11. (D.I. 14 at 3 & ex. 1; D.I. 17 at 6; Tr. at 36; '751 patent, col. 20:42-45) Defendants are quick to point out, and the Court agrees, that "whether a patent is novel and nonobvious in light of prior art is a separate and distinct question from whether it is patent eligible under section 101." (D.I. 21 at 8; *see also IpLearn, LLC v. K12 Inc.*, 76 F. Supp. 3d 525, 534 (D. Del. 2014) ("A new idea, i.e., one that is non-anticipated and non-obvious, does not, however, make an abstract idea patent eligible.")). But in finding that the presence of the "wherein" clause renders it plausible that claim 11 contains an inventive concept, the Court is not, as Defendants fear, "confus[ing] two distinct doctrines." (D.I. 21 at 8)

It is true, as Defendants note, that "[t]he concern of [Section] 101 is not novelty, but preemption." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 56 F. Supp. 3d 813, 825 (E.D. Va. 2014). But here, the Court references this part of the prosecution history because it *speaks* to the issue of preemption. *Cf. Synopsys, Inc. v. Mentor Graphics Corp.*, — F.3d —, 2016 WL 6068920, at *10 (Fed. Cir. Oct. 17, 2016) (noting that the Section 101 inquiry and an invalidity inquiry "'might sometimes overlap.'") (quoting *Prometheus*, 132 S. Ct. at 1304). That is, it indicates that at the time of the application: (1) there were some other known methods of causing a cloud environment configuration to be made available to software; but that (2) at least in the Examiner's view, claim 11 referenced a different and distinct method of doing so—one that amounted to something less than a patent on all such methods. And these facts seem to bear on whether the method found in claim 11 amounts to the utilization of computer hardware and software to perform something other than "well-understood, routine, and conventional activities" in the industry, and whether the claim would unduly preempt the field.

At oral argument, Defendants fought back against the idea that claim 11 could be patent eligible. In doing so, it cited to certain cases to support the proposition that claim 11's inclusion of the "wherein" clause could not possibly invoke an inventive concept. (Tr. at 19-22) In each cited case, the relevant claims were found ineligible under Section 101, despite the fact that they recited the use of only certain types of data or information in order to effect the overall method or goal. *See Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1318 (Fed. Cir. 2016) (requiring, for a system enabling anonymous loan shopping, a database that stores "loan package data specifying, for each of the loan packages, at least a loan type, an interest rate, and a required borrower credit grading"); *Content Extraction*, 776 F.3d at 1345 (requiring the

recognition of information "corresponding to a first data field" for purposes of a method of

processing such information from hard copy documents); *Ultramercial*, 772 F.3d at 712

(requiring, as part of the first element of the representative claim, the use of media products

"comprised of at least one of text data, music data, and video data" for subsequent distribution

over the internet through a "facilitator").

But not only does claim 11 require a greater number of information types (so as to add

greater specificity to the claim), the manner in which claim 11 is said to *use* the information

seems of a different nature than that found in the cases above.  For example, in *Mortgage*

*Grader, Inc. v. First Choice Loan Services. Inc.*, 811 F.3d 1314 (Fed. Cir. 2016), the computer

system at issue in the representative claim included a database that stored "loan package data[,]"

which was required to include at least "a loan type, an interest rate and a required borrower credit

grading[.]" *Mortg. Grader*, 811 F.3d at 1318; *see also* (Tr. at 22).  But in that case, the

limitations on the type of loan package data at issue were tangential to the idea behind the

claimed system, which was all about enabling borrowers to anonymously shop for loan packages.

The elements of the claim were thus drawn to system elements focused on a process for

identifying loan packages for a borrower, in a manner that would render the borrower anonymous

to each of the lenders. *Mortg. Grader*, 811 F.3d at 1318, 1324.[21]  In *Content Extraction &*

*Transmission LLC v. Wells Fargo Bank, National Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014), the

claims merely recited the use of "existing scanning and processing technology to recognize and

store data[.]" 776 F. 3d at 1348 (emphasis added); *see also* (Tr. at 19-20).  While the data

---

[21]     Indeed, the types of loan package data referenced in the claim were so tangential
to the claim's purpose and structure that, when assessing *Alice*'s step two, the Federal Circuit did
not even mention them. *Mortg. Grader*, 811 F.3d at 1324-25.

recognition and storage at issue did relate to information gleaned from "specific data fields such as amounts, addresses and dates[,]" that did not help the claims satisfy *Alice*'s step two. *Id.* This was because the claims implicated the use of a "generic scanner and computer to perform well-understood, routine and conventional activities commonly used in industry" and the limitation of that recognition and storage process only to particular data fields was simply seen as "limit[ing] the abstract idea of recognizing and storing information from hard copy documents using a scanner and a computer to a particular technological environment." *Id.*

Claim 11, in contrast, seems different from the data limitations in these cases. Claim 11 is, in significant part, focused on the sending of an initialization event to cause certain tiers of a "cloud environment configuration" to be made available to software—and the particular configuration at issue is *based on* the use of listed provisioning information. ('751 patent, col. 20:31-34) Thus, the data limitations at issue in claim 11 (as compared to those at issue, for example, in *Mortgage Grader* or *Content Extraction*) appear more closely aligned with the particular activity that is said to constitute the invention itself—i.e., the "setting up" of a cloud computing environment—activity that might have amounted to a non-conventional way of doing so. *See Motorola Mobility*, 81 F. Supp. 3d at 368-69 (finding, in resolving a post-trial motion seeking summary judgment, that the claims of an asserted patent relating to the allocation of wireless bandwidth based on "packet headers" (i.e., data) were directed to patent-eligible subject matter, explaining at step two that "[e]ven though claim 1 itself does not provide a detailed explanation of how packet headers are used to allocate . . . bandwidth, the inventive concept lies in the limitation of using packet headers to allocate bandwidth, not in the details of implementation").

28

On the record before the Court, then, the presence of the "wherein" clause, when combined with other apparent limitations, highlights genuine fact questions that preclude grant of the Motion: whether claim 11 would preempt the "building blocks" of research in the field and "risk disproportionately tying up the use of the underlying ideas," or instead would amount to "more than a drafting effort designed to monopolize the abstract idea." *Alice*, 134 S. Ct. at 2354-55, 2357 (internal quotation marks, brackets and citations omitted); *see also Internet Patents*, 790 F.3d at 1348 (finding a claim ineligible where it contained "*no restriction* on how the result is accomplished") (emphasis added); *DDR Holdings*, 773 F.3d at 1249-51, 1259 (finding the presence of an inventive concept that did not preempt every application of the abstract idea at issue, where the claims recited an invention that was "not merely the routine or conventional use of the Internet" but rather a sequence that directed users to a "hybrid" web page that preserved the "look and feel" of the host web page—e.g., logos, colors and page layout—instead of sending the user to a completely different third-party site). In recommending the denial of Defendants' Motion without prejudice, the Court is not concluding that the '751 patent is patent eligible. It is simply determining that the Court cannot conclude, as a matter of law at the pleading stage, that the patent is not.[22]

---

[22]    The Court has also reviewed the result in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), a case where the Federal Circuit recently concluded that the claims at issue were subject matter ineligible. However, after reviewing that decision, the Court has concluded that the result there does not require it to grant Defendants' Motions in the instant actions. The patents at issue in *Electric Power* were directed to "systems and methods for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results." *Elec. Power*, 830 F.3d at 1351. The representative claim at issue was a method of detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the interconnected power grid comprising the steps of (1) receiving data (including time-stamped synchronized phaser measurements, data from other power system data sources, and data from a

### C. The Remaining Claims

Defendants' Motions were directed to all claims of the '751 patent. The Court has determined that it is not clear that representative claim 11 is subject matter ineligible under the *Alice* analysis. There is no dispute that remaining independent claims (i.e., claims 1, 5, 8, 15 and 18)—and by extension, the remaining dependent claims—all require the same (or similar) limitations as do claim 11. (D.I. 14 at 4-7; *see also* D.I. 14 at 4, Civil Action No. 15-638-LPS-CJB) Therefore, the Court recommends that the Motions also be denied as to claims 1-10 and 12-20 of the '751 patent.

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' Motions to Dismiss be DENIED, without prejudice to Defendants' ability to later renew a Section 101 challenge in the form of a summary judgment motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

---

plurality of non-grid data sources); (2) analyzing the data; (3) displaying the data; and (4) deriving a composite indicator of power grid vulnerability. *Id.* at 1351-52. The Federal Circuit found that even where "a large portion of the lengthy claims [was] devoted to enumerating types of information and information sources available within the power grid environment[,]" there was "nothing sufficient to remove the claims from the class of subject matter ineligible for patenting." *Id.* at 1354-55.

*Electric Power* differs from the instant case in that it was decided at the summary judgment stage, whereas here, the Court does not have the benefit of a fully-developed factual record. At the summary judgment stage, the *Electric Power* Court could conclude that the claims at issue did not require "any nonconventional computer, network, or display components, or even a 'non-conventional and non-generic arrangement of known, conventional pieces[.]'" *Id.* at 1355 (quoting *Bascom*, 827 F.3d at 1350). The Court does not have enough information to make a similar conclusion here.

within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: November 3, 2016

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE